# CIRCUIT COURT OF BALTIMORE CITY

Filed June 21, 1890.

CONSTABLE ET AL.

VS.

CHRISTIAN DEVRIES, TRUSTEE.

*Charles Poe, Wm. F. Frick, A. W. Machen, Barton & Wilmer, Charles W. Field, B. Howard Haman* and *George M. Sharp* for plaintiffs.

*Charles Marshall* for defendant.

**DENNIS, J.—**

On the 6th of November, 1886, Philip Hanson Hiss, Henry S. Hiss and Philip Hiss, trading as P. Hanson Hiss & Co., executed a deed of trust for the benefit of their creditors, both individual and co-partnership, in the usual form, to Christian Devries, who accepted the trust, and asked this Court to assume jurisdiction over its administration.

Shortly afterwards an agreement was entered into by the unsecured creditors, to be binding when assented to by seventy per cent. of their number authorizing the trustee to continue the business to the extent of manufacturing the large and costly stock of material on hand (and to purchase such goods as might be necessary to complete the manufacture of the same), and of finishing all work on hand, and executing all orders already received at the date of the assignment. To enable the trustee to do this and to pay off unsecured creditors who might refuse assent to the arrangement, he was authorized to borrow such sums of money as might be necessary, which loans it was agreed should constitute a first lien upon the assets of the trust estate. By the same agreement, the trustee was authorized to borrow money, in his own discretion, when it might be for the benefit of the estate and necessary to prevent a sacrifice of the property in order to pay off the liens, by way of mortgage, claims of materialmen, &c., upon the large body of real estate situated in the city, and also in what was then Baltimore County, and belonging to the individual estate of P. Hanson Hiss, all of which real estate was very heavily encumbered.

Upon the petition filed by the trustee setting forth this agreement, and that it had received the assent of seventy per cent. of the unsecured creditors as required by its terms, the Court on December 22nd, 1886, passed an order directing him to proceed with the administration of the trust in accordance with the plan and conditions of the said agreement.

Acting under this order, the trustee continued the conduct of the business by the manufacture of the materials already on hand, and execution of the orders already received until thinking the time had arrived for closing the estate, on November 29th, 1887, he sold out, at public auction, the manufactured material remaining on hand, and all the manufactured furniture which had not already been disposed of at retail. The sale continued for four days, as there was a large stock on hand. In the meanwhile he had also sold at public and private sale the several pieces of real and leasehold estate which had come into his hands; all of which sales were duly reported to the Court and ratified, after the usual notice, no objections having been filed.

On the — day of December, 1888, he returned his account to this Court.

To this account exceptions have been filed by several creditors, the grounds of which will be stated and considered later.

On the same day this account was filed Arnold, Constable & Co. and other creditors filed their bill against the trustee and the Hiss Manufacturing Co. (of which Mrs. P. Hanson Hiss was the sole stockholder), and Mrs. Hiss, wife of Philip Hanson Hiss, &c., and the two last named defendants having been large purchasers of the stock of both the manufactured and unfinished material at the auction sale, and Mrs. Hiss also having been a large purchaser of the real estate situated in the city, charging mismanagement, negligence and waste on the part of the trustee in his administration; collusion between him and the aforesaid purchasers in the said administration and sales; and praying for the removal of the trustee, the appointment of a receiver, and a declaration that a trust exists for the benefit of the creditors of P. Hanson Hiss & Co. as to all the property of every description sold and transferred, either at public or private sale to Mrs. Hiss or the Hiss Manufacturing Company.

As agreed by counsel, the bill and exceptions were heard together, upon the evidence taken in support of the latter.

The case upon the bill will be first considered.

It is unnecessary to recite all of its averments. All the material ones are

denied by the answers; as to several, no proof was offered; and others were practically abandoned at the hearing. Those which I understand the solicitors for the plaintiffs mainly rely upon will be considered *seriatim*, although the voluminous testimony (amounting to over a thousand pages, besides a great mass of exhibits), will prevent more than a brief recital of the facts upon which the conclusions are based.

It is proper to state at the outset that the solicitors for both the exceptants and the plaintiffs expressly disclaimed at the hearing any reflection upon the personal integrity of the trustee.

The bill charges misconduct by the trustee in the following respects:

1. In the statement made to the Court that seventy per cent. of the unsecured creditors had agreed to the proposed plan for continuing the business; because the note held by the bank of Baltimore (whose debt was counted in order to make up the seventy per cent.), was secured by the individual endorsement of P. Hanson Hiss.

It is sufficient to say that the agreement was to be signed by the unsecured creditors of P. Hanson Hiss & Co. and of P. Hanson Hiss; and if the note is to be treated as a debt of P. Hanson Hiss & Co., secured by P. Hanson Hiss, it is also to be treated as an unsecured debt of P. Hanson Hiss, individually, and hence was properly counted under the agreement.

2. As to the sales of the city real estate.

These sales were all reported to the Court, and duly ratified, without objection on the part of any creditor, and I think the testimony shows brought the best obtainable price. That they were purchased by Mrs. Hiss makes no difference. She had a large separate estate and was as much entitled to purchase as any one.

As to the Charles street property, it was first offered both at public and private sale without a bid, and the testimony of real estate experts shows that the existence of the permanent ground rent of $1,800 a year substantially destroyed its saleable value.

The Lexington street property was likewise subject to a large ground rent, and no better evidence can be given of its value than the action of the Savings Bank in regard to its mortgage upon it. The sale of the factory was made at public auction, after due advertisement, and was purchased by Mr. Pratt, and the sale was duly reported to the Court and after the usual notice ratified, no exceptions having been filed. That Mr. Pratt purchased it for Mrs. Hiss can make no difference, if the sale was fairly made. I can find no evidence, either in the prices realized or from the circumstances attending the sales of the real estate of any wrongful action on the part of the trustee.

3. As to the employment by the trustee of the members of the firm of P. Hanson Hiss & Co., and their employees in the management of the business.

The trustee, as was certainly known to all the creditors, was himself without the special knowledge required to carry on the business. The agreement of the creditors, therefore, which looked to its continuance, must necessarily have contemplated the employment of some persons competent to conduct it. By providing for the execution of the uncompleted orders also, it would seem the creditors must have intended the employment of the Hisses, as the rich and fashionable purchasers of the firm would hardly have been satisfied with the handiwork of unknown makers. But whether the employment of these parties was actually intended or not by the creditors at the time of the execution of the agreement, it is very clear that their employment was for the best interests of the estate, and necessary to the continuance of the business. Their employment was authorized by order of Court, which also fixed their salaries; and while these salaries were high, there has been no attempt made to show that they were higher than the services performed were worth.

4. As to the auction sales.

Having conducted the business, in pursuance of the agreement of creditors, from December, 1886, and the orders uncompleted at the time of the assignment having been finished, the trustee in November, 1887, determined to offer the stock remaining on hand, consisting both of unmanufactured material and manufactured furniture, for sale at public auction in order to close the estate. For this purpose he employed the firm of Matthews & Kirkland, the well known auctioneers, turning the property over to them to be arranged, catalogued, advertised, &c., as they might think proper. Thereupon, the store was closed, and Mr. Kirkland, with the assistance of the Hisses

and the other employees, proceeded to arrange and catalogue the stock. The sale commenced on the 29th of November and lasted four days, and a large portion of the stock was purchased by Mrs. Hiss, and it is not disputed that her own money was used in payment.

Great stress is laid upon the low price at which the goods sold, and particularly in the way in which the large stock of wall paper was offered; in consequence of which it is claimed Mrs. Hiss was enabled to buy it at prices far below its real value.

That the prices realized for all classes of articles offered was far below its actual value, is not surprising. The bulk of the stock was rich upholstery goods, fancy woods, and wall papers, many of the latter very expensive, and all unsuited for the general public. In short, it is well known that Hiss' customers were rich and fashionable people, and only such could afford to deal with him. It is no doubt true that if the time had been taken to sell out the wall papers in smaller lots more money would have been realized, just as it is true that if they had been retailed in quantities to suit the wants of any individual purchaser they would have brought still larger prices. But this was manifestly impracticable. Here was a large sale, sure to last several days, in which the value of the paper to the rest of the stock bore but a small proportion; the auctioneer, one of the oldest and most experienced in the city, testified that he had sold even larger lots at other sales, that there were several dealers present, who had every opportunity to examine the samples of the stock which were on exhibition, and that it was catalogued in the usual way. A considerable portion of it was in "broken lots"; some of it was "out of fashion," and in the expressive language of one of the witnesses, "it was like trying to make sale of last year's bonnets." The auctioneer testifies that the property sold at good prices under the circumstances, and I think the testimony of the other witnesses bears him out in the assertion; but whether this is so or not, there is no evidence to impeach the fairness of the sale, or to show any collusion between Mrs. Hiss and the trustee, or any improper conduct on the latter's part. If a mistake was made in the manner of offering the wall paper, or the rest of the stock, it was an honest one, for which the auctioneers were responsible, upon whose judgment and experience the trustee relied, as he was bound to do.

But it is insisted that all the purchases by Mrs. Hiss shall be set aside and a resulting trust decreed in favor of the creditors, irrespective of the question of actual fraud or collusion in the sales, by reason of the rule of law which forbids the agent of the trustee, equally with the trustee himself, from purchasing trust property. The rule is thus stated in Lewin on Trusts (p. 486), where after speaking of the principle which forbids the trustee himself from purchasing, the author says: "And the rule against purchasing the trust property applies to an agent employed by the trustee for the purposes of the sale as strongly as to the trustee himself." And it is contended that this case is brought within the operation of the rule, because the Hisses and one or two others, who had been employed by the trustee while he was conducting the business under the agreement of the creditors, were bidders-in for Mrs. Hiss at the auction sale, and had assisted Kirkland, at his request, in arranging and cataloguing the stock. I do not think so.

It is uncontradicted that when the trustee determined upon the auction sale he turned over the entire stock to the auctioneer with instructions to sell in the best manner possible. The doors were locked, all operations suspended, and the auctioneer was placed in complete possession and became responsible to the trustee for the faithful performance of his duties. From that moment the relation of employer and employees between the trustee and the Hisses ceased, as did also the functions of the latter with respect to the property. The auctioneer, in arranging the large stock of so many different kinds of goods, naturally sought the assistance of some of the former employees of the business, and it is doubtful if he could have arranged the property advantageously for sale without such assistance. I suppose no auction sale of a large and mixed stock ever occurs without a similar resort by the auctioneer for assistance and suggestions to those who are necessarily best acquainted with the property. But the Hisses and the other employees who had thus been employed by the trustee when the business was a going concern, and had afterwards assisted the auc-

tioneer in the manner described, had nothing whatever to do with the sale. There is not a word of testimony to show, or which even intimates, that any of these persons were employed by the auctioneer in making the sale, or were permitted to control or direct it, or had any relation to it whatever, except as outside third parties.

The very language of the rule as laid down by Lewin restricts the prohibition to purchase "to an agent employed by the trustee for the purpose of the sale." It rests upon the same principle which forbids a trustee to purchase at his own sale, viz: that the law will not allow one to occupy a position in which his interests and his duty may conflict.

Hence clearly, to bring an agent within the operation of the rule he must be an agent with reference to the particular thing which is to be done, and therefore chargeable with some duty or trust in respect to it.

Take the illustration suggested at the hearing. A man is employed to build a house; in the course of his employment he certainly would obtain a better knowledge of its character and value than any one else; and yet, if after its completion its owner was to put it up at auction, it would hardly be contended that the builder was disqualified from buying by reason of his superior information of its value acquired in its erection. So in this case, the Hisses were only employed by the trustee during the continuance of the business, and their duties were wholly confined to the period of its active operations. When he closed the business, their relations to him wholly terminated; and it would seem clear that no knowledge or information obtained by them while engaged in the manufacture of the stock, or in the arrangement of the unmanufactured articles, should disqualify them, or any of them, from bidding at the auction sale, either on their own or a third party's account, any more than the builder of the house would have been disqualified in the case put.

As to the sale itself, Kirkland testifies that it was one of the best sales of stock of that kind he had ever made, and that Mrs. Hiss' bidding contributed largely to its success.

It must be manifest, without testimony, that without so active a competitor as she proved to be, the stock would have realized considerable less money.

The only other objection urged to the sale was what has been called the "Grinsfelder incident."

Grinsfelder, a dealer in a similar class of goods, appeared at the sale on the last day, with the intention mainly, as confessed by himself in his testimony of "being bought off." It was a common practice with him, upon the occasion of such sales, as he testifies. A friend of Mrs. Hiss', who was present, and who, knowing that she wished to buy largely, wanted to rid her of such a competitor, offered Grinsfelder fifty dollars to withdraw; which proposition the latter resented as an indignity—"as he was no fifty dollar man." Upon the proposition being renewed, however, and the price of his withdrawal increased to two hundred dollars, his scruples subsided, and he withdrew to cash the check he had received for the sale of his absence.

Unjustifiable as this action unquestionably was on the part of the person who bought off this possible competitor, it is undisputed he had no official connection whatever with the sale; that he had no relations whatever to either the trustee or Mrs. Hiss (except as an indiscreet friend of the latter); and that neither the trustee or Mrs. Hiss or her agents were in any way connected with the transaction, or even knew of it until after the sale was completed. It occurred on the last day, and after the great bulk of the purchases by Mrs. Hiss had already been made; and as there has been no attempt to show complicity on the part either of the trustee or the purchaser in the transaction, I do not see upon what equitable grounds the entire sale should be set aside.

In the consideration of this branch of the case I have made no reference to the incorporation of the Hiss Manufacturing Company, of which Mrs. Hiss was the sole stockholder; or to the fact that purchases were made in its name; because the consideration which induced its organization are clearly set forth in the testimony, and were entirely proper and natural, and it will hardly be disputed that, if Mrs. Hiss was a competent purchaser, the new company organized by her must have been equally so.

5. The sale of the stock in the branch house in Washington.

The stock in this store consisted mainly of samples of upholstery and furniture (orders being supplied from the warehouse here), of a lot of wall paper and bric-a-brac. This stock of paper and the upholstery goods were inventoried by employees of the auctioneer who went to Washington for the purpose, and were sold by samples here along with similar stock from the factory; and what has been already said in regard to the sale here applies equally to it. None of the stock in the branch house was actually brought here before the sale, for the following reasons: After the catalogue of the furniture in the warehouse had been made, the trustee informed the auctioneer that there were samples of furniture in the branch house, and asked his advice about how it was advisable to dispose of it. The latter advised him that there was already furniture enough on the catalogue for one sale, and that if he could get a fair price at private sale as it stood, it would be best to dispose of it in that way, as it would save the expense of freight. commissions, &c. Acting upon this advice, after the sale here, the trustee sold the furniture and bric-a-brac in Washington to Mrs. Hiss at private sale, the furniture bringing, according to his calculation and including the saving in freight, &c., about 12 to 15 per cent. more than the same line of goods brought at the auction. The bric-a-brac was also sold to Mrs. Hiss, at private sale, at a price fixed upon by disinterested appraisers. I can see nothing improper in this transaction. There is no charge of fraud on the part of the trustee, nor any suggestion that in any of the purchases by Mrs. Hiss the money used was other than her own separate estate. And I think any one who considers the character and quality of the goods and examines the prices realized at the public auction, must be satisfied that this Washington furniture (which consisted wholly of samples, many of which had been in the store for two or three years), and bric-a-brac brought more money than it would have brought if offered at public auction.

This disposes of all the charges relied on in support of the bill, which must therefore be dismissed.

The exceptions to the auditor's report and account remain to be considered.

Several conceded errors occur in the account, but as they were agreed upon at the hearing, they need not be considered. The errors still insisted upon are, 1st, the basis upon which the trustee's commissions are computed; and 2nd, the rate of commissions.

1st. Under the agreement of the creditors which directed the trustee to continue the business, he was authorized to borrow such sums as might be necessary to complete the unfinished orders on hand at the time of the assignment and to work up the unmanufactured stock, and also such additional sums as might be necessary to complete the unfinished houses in course of erection in Baltimore County, and to relieve the other property from such liens as might threaten its sacrifice. It is urged that the sums so borrowed constitute no proper basis for a charge of commissions, but that they should be calculated solely upon the amount of property which passed into the trustee's hands in the first instance under the deed of trust.

The money borrowed to complete the orders and work up the unmanufactured stock, went into and became a part of the trust estate as fully as if it had been conveyed under the deed of trust. There is no suggestion that more was borrowed than was necessary for the purposes contemplated by the agreement of the creditors, or that it was used improperly or injudiciously, and this part of his administration was so well conducted by the trustee that the charges for interest on the entire amount borrowed amounted to only a few hundred dollars. His responsibility on his bond for this money and for its proper employment, was the same as for the rest of the estate; and I am unable to see why it should not be considered a part of that estate for the purpose of allowance of commissions as fully as it must be so considered for every other purpose. Of course, if it was shown that he abused his trust and borrowed more than was necessary, a very different case would be presented, and very different conclusions would be drawn.

A large sum was also borrowed to pay off certain prior encumbrances upon the Baltimore County property, and it is insisted that this sum should be likewise deducted from the proceeds of sale, and only the balance be treated as the basis for commissions.

It is clearly proven that the redemption of the property from these liens

was wise and judicious, in fact, necessary to a realization of anything like full value for the equity of redemption, so that there is no ground for denial of commissions to the trustee because of misconduct in obtaining the loan. If the prior mortgagee had consented to a sale free from his mortgage by the trustee, there can be no doubt the trustee would have been entitled to commissions upon the full amount realized from the sale (Tome vs. King, &c., 64 Md.), and it would seem therefore, to follow that, if the trustee borrows money to pay off the debt, the sum so brought into the trust estate for its manifest benefit, ought to stand on a footing with the rest of the property. He is under the same responsibility, on his bond, as to this fund as to the rest of the estate, and, so far as I am informed, it has always been the practice in this Court to allow commissions upon the total amount of sales in such a case.

2. The rate of commissions.

When the deed of trust fixes no specific rate of commissions, the rate to be allowed rests in the discretion of the Court, subject to certain general rules. In the case of a trustee or receiver appointed simply to sell, commissions are fixed by the rule of Court, which gives him a graded allowance up to the sum of $3,000 and 4 per cent. upon the proceeds of sale in excess of that limit. But where, as was the case here, the trustee is authorized to manage and operate the business, then his commissions should be regulated by analogy as far as possible to those which are allowed to receivers appointed for a similar purpose, which is 8 per cent. And this rate is subject to augmentation or diminution for special causes shown. See Tome vs. King & Stirling, 64 Md. 180, &c.

In this case the auditor has allowed 8 per cent., which would be the allowance ordinarily; but in view of the circumstances of the case, I am of the opinion that this rate is too high.

Legal services constituted the great bulk of the work in connection with the Baltimore County property, and for these services the trustee's attorneys have been allowed compensation out of the trust estate.

The management of the business in this city was necessarily, as has been already explained, left in the hands of the members of the firm of P. Hanson Hiss & Co., subject to the general supervision of the trustee, and it is manifest that from the nature of the case, there was but little call for his individual services, except for the purposes of negotiating loans and attending to the financial part of the business, and these employees have already been allowed out of the trust estate large salaries for their services.

Under these circumstances, and considering the large amount upon which whatever commissions that may be allowed must be calculated, I think an allowance of five per cent. in this case is fair and ample. The trustee has managed the estate honestly and with a fair degree of judgment; and while the results have greatly disappointed the expectations entertained by all interested in it at the time of the assignment, it is easy to see now that these expectations rested upon the false basis of a gross over-estimate of the value of both the real estate and the personal chattels. The exception to the auditor's account as to the allowance of the rate of commissions will therefore be sustained, and the papers referred back for a new account in conformity with this opinion, and for the correction of the errors conceded by counsel at the hearing.